Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**JOHN T. RIBBLE**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

GEORGE ABEL,                          )
                                      )
    Appellant-Petitioner,         )
                                      )
        vs.                  )    No. 49A02-1206-PC-487
                                      )
STATE OF INDIANA,                     )
                                      )
    Appellee-Respondent.          )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant W. Hawkins, Judge
Cause No. 49G05-0108-PC-175181

**October 31, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

George Abel appeals the denial of his petition for post-conviction relief. Abel asserts the court erred when it determined his trial counsel's failure to obtain evidence of his mental retardation and present it at sentencing did not constitute ineffective assistance of counsel. We affirm.

## FACTS AND PROCEDURAL HISTORY

Our opinion disposing of Abel's direct appeal set out the underlying facts as follows:

Eighty-three year-old Mattie Barbie owned a two-story house at 617 W. 32nd Street in Indianapolis. In August of 2001, Malene Ivy was staying in one of the two bedrooms on the second floor of the house, and Barbie used the other. Also Abel – Barbie's distant cousin – was staying at the house, sleeping in a bed in the dining room on the first floor.

On Saturday, August 25, 2001, Ivy came to the house and went upstairs to her bedroom about 6:30 p.m. Later, Abel arrived, and Barbie let him in.

On Sunday morning, Barbie arose and went downstairs, turning right at the bottom of the stairs (the opposite direction from her living room) to go into the kitchen and make herself breakfast. Barbie's son Nate knocked at the front door, and Abel let him in. Abel went to the living room and sat on the couch, where Nate saw Ivy "sitting in the corner" of the same couch. Abel told Nate that Ivy was "just asleep, said she had been drinking." Nate went into the kitchen and visited with Barbie. After a while, Abel left the house.

Later that afternoon, Nate returned with his girlfriend, Marie. Nate saw Ivy "was still sitting on the couch" in virtually the same position and said to Barbie, "[Ivy] hasn't moved, is she all right?" Marie, a woman with some nurse's training, went to Ivy, who was partially covered with a blanket, and touched Ivy's wrist. Finding it cold, she told Nate and Barbie that Ivy was dead, and Barbie called the police.

The police and EMS arrived, and the latter declared Ivy dead. An autopsy, performed at 8 a.m. on Monday, August 27th, found that the cause of Ivy's death was "manual strangulation with blunt force injury of the neck and head."

On Tuesday, August 28th, Detective Allen Knight questioned Abel. Abel was advised of his *Miranda* rights and signed a waiver. Abel told Knight that on Saturday night, he had gone to Ivy's bedroom and asked her to go out with him, but she had declined. He said he then confronted her about a sum of money, and "they began to play wrestle, after which he began to demonstrate or play with her placing her in a variety of chokeholds. . . ." Abel said he

2

"asked her if I did this to you what would you do in response, or what would you do it I did this, and she said to him, I'll hit you in the mouth." *Id.* Abel said he had used "a particular chokehold," which he demonstrated to Knight, and said that afterwards Ivy "went limp." Abel told Knight that although Ivy was bleeding "heavily," she was still conscious and said she did not need medical attention, and he "got a towel and cleaned her up." He said that "he then took her downstairs and placed her on the couch" and "covered her with a blanket." At that point in his interview, Abel requested an attorney. Pictures taken of Abel depicted scratches on the inside of one arm, a scratch on his chest, and marks on the back and knuckles of his hand.

On August 31, 2001, the State charged Abel with murder, alleging that he knowingly killed Ivy. Abel waived trial by jury, and was tried to the bench on August 12, 2002. Forensic pathologist Dr. Dean Hawley testified that the force applied to Ivy's neck "was of sufficient magnitude to crush the jugular veins, the carotid arteries and the airway, and, in fact, broke completely through the cervical spine," fracturing "through the body of the fourth cervical vertebrae behind the larynx." The injury to Ivy's neck "was either immediately fatal or caused immediate paralysis." Hawley further testified that Ivy had suffered severe blows to the head causing "internal damage to the brain," as well as a laceration "through the eyebrow," another "across the bridge of the nose" that exposed the bone of her nasal bridge, and "severe lacerations through the surfaces of the lips" inside her mouth caused by being "smashed over" the edges of her teeth." According to Hawley, the "best range" of the time of Ivy's death was 24 to 48 hours prior to the autopsy. Hawley demonstrated the chokehold-type method he believed had been used to inflict Ivy's strangulation injuries. He opined that in such circumstances, "you almost always see" scratches inflicted on the perpetrator by the victim. Shown the pictures of the marks that Abel bore on August 28th, Hawley found "this is exactly the kind of injuries that you see most of the time" when the victim is strangled by that particular chokehold.

Knight testified as to Abel's admissions and demonstrated to the trial court the "particular chokehold" that Abel had shown to him as the one after which Ivy "went limp." Abel testified and denied telling or demonstrating to Knight his using a chokehold on Ivy. Abel further testified that he had been simply "playing, playing wrestling" with Ivy on Friday night, after which he had gone downstairs, heard a thump and went downstairs to find Ivy on her knees and bleeding from the forehead; he got her a washcloth, and she said she was "OK." Later, she came downstairs and fell; he picked her up and she fell again. Then he put her on the couch. Abel insisted in his testimony that Ivy had remained on the couch from Friday night until Sunday.

The trial court found Abel "guilty as charged." At the sentencing hearing on September 19, 2002, the trial court found Abel's "childhood

3

deprivation" and "the possibility of some emotional limitations" to be "mitigating factors but they don't mitigate much." It found Abel's child molesting conviction to be a "much more aggravating" factor and described Abel's extensive criminal history. It then determined that "the aggravating factors do outweigh the mitigating factors" and imposed a sentence of sixty years.

*Abel v. State*, No. 49A02-0210-CR-871, *slip op.* at 2-5 (Ind. Ct. App. 2003) (citations to record omitted).

Abel raised two issues on direct appeal: 1) whether the evidence was sufficient to support Abel's murder conviction, and 2) whether Abel's sentence was inappropriate in light of his character and offense, arguing that the trial court did not consider and apply all significant mitigating factors before it at the time of sentencing. We affirmed. *Id.*

Abel subsequently brought a petition for post-conviction relief, asserting trial counsel provided ineffective assistance by failing "to present evidence at sentencing that Abel suffers from mental retardation, with a record of a low intelligence quotient (IQ) on psychological testing." (P-C. App.[1] at 51.) Abel claimed counsel's failure to present that evidence prohibited the court from having an opportunity to consider his mental retardation as a mitigator for sentencing. At the hearing on Abel's petition, Abel called trial counsel Lindsay Schneider and Dr. Dennis Olvera, a psychologist, as witnesses. After hearing evidence, the post-conviction court denied Abel's petition in an order that included findings of fact and conclusions of law.

---

[1] We have before us records from both Abel's criminal trial and his post-conviction proceedings. To distinguish between the transcripts and appendices, we will use "App." and "Tr." to designate records created for Abel's direct appeal and will refer to the records created for this appeal of his post-conviction proceedings as "P-C. App." and "P-C. Tr."

**DISCUSSION AND DECISION**

Post-conviction proceedings are not "super appeals;" rather, those proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013). Post-conviction proceedings are civil in nature, and petitioners bear the burden of proving their grounds for relief by a preponderance of the evidence. *Id.*

When a petitioner appeals the denial of post-conviction relief, he appeals from a negative judgment and has the burden of proof. *Id.* Consequently, we may not reverse unless the petitioner demonstrates the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Id.* "'In other words, the [petitioner] must convince this Court that there is *no* way within the law that the court below could have reached the decision it did.'" *Id.* (quoting *Stevens v. State*, 770 N.E.2d 739, 746 (Ind. 2002)) (emphasis in original). We accept the post-conviction court's findings of fact unless they are clearly erroneous, but we do not defer to its conclusions of law. *State v. Hollin*, 970 N.E.2d 147, 151 (Ind. 2012). On appeal, we may not reweigh the evidence or reassess the credibility of the witnesses. *Id.* at 150.

Abel asserts his trial counsel provided assistance that failed to meet that guaranteed by the Sixth Amendment to the United States Constitution. Claims of ineffective assistance of trial counsel are generally reviewed under the two-part test announced in *Strickland v. Washington,* 466 U.S. 668 (1984), *reh'g denied*. *Wilkes*, 984 N.E.2d at 1240. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence

5

resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

First, a claimant must demonstrate counsel's performance was deficient because it fell below an objective standard of reasonableness based on prevailing professional norms. *Hollin*, 970 N.E.2d at 151. We afford counsel considerable discretion in choosing strategy and tactics. *Id.* Thus, poor strategy, inexperience, isolated mistakes, or instances of bad judgment will not necessarily render counsel's representation ineffective. *Id.*

Second, a claimant must demonstrate counsel's deficient performance resulted in prejudice. *Id.* Prejudice has occurred when the petitioner demonstrates a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is one sufficient to undermine our confidence in the outcome. *Id.* "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Abel asserts his counsel's assistance was constitutionally ineffective because counsel failed to present evidence of Abel's mental retardation at sentencing and argue it was a mitigator.[2] There is no question that mental retardation can be a mitigator. *See McCarty v.*

---

[2] The State argues we cannot review an issue regarding Abel's "mental retardation as a mitigating factor at sentencing," (Br. of Appellee at 11), because, on direct appeal, Abel argued the trial court failed to consider this mitigator when sentencing him. *Res judicata* prevents review of issues already litigated and decided adversely to the petitioner. *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2013). However, we decline to apply that doctrine here. On direct appeal, Abel alleged his sentence was inappropriate in light of his character and offense because the court had not considered "all significant mitigating factors before it at the time of sentencing." *Abel*, No. 49A02-0210-CR-871, *slip op.* at 7. In this post-conviction appeal, Abel is asserting his trial counsel's assistance was constitutionally ineffective because counsel did not present evidence of his low

*State*, 802 N.E.2d 959, 967 (Ind. Ct. App. 2004). Nor is there any doubt that failure to present evidence of a defendant's mental retardation could constitute ineffective assistance of counsel. *See id.* (holding counsel provided ineffective assistance by failing to investigate and present numerous potentially mitigating circumstances, including defendant's mental retardation, to the court at sentencing).

Nevertheless, the post-conviction court entered detailed findings explaining why Abel was not prejudiced by trial counsel's failure to use the words "mental retardation" or "IQ" at his sentencing hearing:

> [T]rial counsel did argue that Abel's "diminished capacity" was a mitigator which far outweighed the aggravators. *See* T.R. 209, 210, 212. Along these lines he urged the court to consider that the offense may have been a situation where Abel did not know his own strength. *See* T.R. 209-210. It is apparent that counsel's arguments were based upon evidence properly before the court-- facts set forth in the in the [sic] presentence report and also in the evaluations of Abel by Drs. Masbaum and Olive. *See e.g.* T.R. 209 (Mr. Schneider's argument included, "If you read the presentence report, Your Honor, Mr. Abel apparently, because of his diminished capacity . . . which can be considered by Your Honor as mitigation or a mitigating factor . . ."). While trial counsel did not specifically use the words "IQ" or "mental retardation," his arguments asking the court to note Abel's diminished capacity as set forth in the presentence report seem to already have accomplished the same thing that Petitioner now alleges counsel should have accomplished. This Court "cannot and will not find…trial counsel ineffective for failing to do something that he did, in fact, do." *Perry v. State*, 904 N.E.2d 302, 309 (Ind. Ct. App. 2009) (finding trial counsel not ineffective for allegedly failing to argue defendant's mental health as mitigator where trial counsel did mention the issue during sentencing argument), *trans. denied.* Petitioner has not proven deficient performance here. Accordingly, this claim fails.

---

IQ at the sentencing hearing. Although those two issues are not completely unrelated, neither are they sufficiently identical to bar Abel's request for review. *See Reed v. State*, 856 N.E.2d 1189, 1195 (Ind. 2006) (holding *res judicata* did not bar petitioner's claim of ineffective assistance of counsel during sentencing because post-conviction claim was not "using different language to rephrase an issue that was adversely decided on direct appeal).

Nor has Petitioner shown a reasonable probability that additional efforts to highlight his intellectual disability would have led to a more favorable sentencing decision by the trial court. First, this Court disagrees with Petitioner's contention that the trial court did not have the opportunity to consider Abel's intellectual disability as a mitigator. In addition to Mr. Schneider's argument, the presentence report and the detailed evaluations of Abel by Drs. Masbaum and Olive were known to and reviewed by the court prior to sentencing Abel, and the information therein was available for the court's consideration in imposing the sentence. The argument in Abel's Petition -- that trial counsel "should have been aware of Abel's low IQ before sentencing because it is mentioned in the presentence investigation report . . . that Abel was sent to a juvenile facility in Wisconsin in 1987 (when he was 15 years old) and given psychological testing that indicated he had an IQ of 53 . . . [and] states that he 'was always enrolled in Special Education classes'" -- essentially negates the prejudice prong of Petitioner's claim of ineffectiveness. As noted supra, the inclusion of these facts in the presentence report was evidence that was in fact before the trial court and available for its consideration in imposing Abel's sentence. And Mr. Schneider's argument urged the court to consider the evidence in the presentence report of Abel's diminished capacity.

Further, if Petitioner is implying that more detailed information, or the testimony of a psychologist such as Dr. Olvera, would have created a reasonably [sic] probability of a more favorable sentence, this Court is not persuaded. Dr. Olvera's testimony explains that Abel's IQ of 53 – the same number noted in the presentence report – is in the upper range of the moderate intellectual disability category, close to being categorized instead as mild intellectual disability. Petitioner's evidence further shows that, in 1987, Abel's IQ was in fact in the mild intellectual disability category. When asked how a person's IQ would justify a lesser sentence, Dr. Olvera simply responded that IQ pertains mainly to the determinations of competency and insanity -- issues which the trial court had already considered and decided prior to Abel's trial.

Petitioner has not proven a reasonable probability that the presentation of more evidence at sentencing of Abel's mental disabilities, in addition to what was already before the court, would have resulted in a lesser sentence – particularly in light of the significant aggravating factors noted by trial court and affirmed on appeal. Given Petitioner's failure to prove prejudice, again this claim of ineffective assistance of trial counsel fails.

(*Id*. at 107-08.)

In support of those findings, we note trial counsel urged the court at sentencing to

8

"read the presentence investigation report," (Tr. at 209), noted that report demonstrated Abel's "diminished capacity," (*id.*), for which he had been "taken advantage of and abused his whole life," (*id.*), and asserted the court could find that diminished capacity as a mitigating circumstance. Counsel also obtained, prior to trial, evaluations to determine whether Abel was competent to stand trial, and one of those reports noted Abel had been in special education classes and had an IQ of 53.[3]

The judge presiding over Abel's post-conviction proceeding was the same judge that sentenced Abel, and he specifically found that he had been aware at sentencing of Abel's mental limitations from the reports of Dr. Masbaum and Dr. Olive and from the presentence report. We are not in a position to overturn such finding. *See Perry v. State*, 904 N.E.2d 302, 309 (Ind. Ct. App. 2009) (record supported post-conviction court's finding the sentencing court knew about defendant's mental health issues based on counsel's arguments at sentencing regarding suicide attempts, manic depression, and drug use, such that counsel was not ineffective for failing to offer "mental health" as a mitigator), *trans. denied*. Nor, in light of the post-conviction court's numerous relevant findings in support thereof, may we overturn the post-conviction court's conclusion it would not have imposed a different sentence if trial counsel had presented additional evidence or argument. *See*, *e.g.*, *Witt v. State*, 938 N.E.2d 1193, 1200 (Ind. Ct. App. 2010) (holding counsel's failure to take more steps to establish Witt was mentally retarded was not ineffective assistance, where the court

---

[3] These facts distinguish this case from *McCarty*, 802 N.E.2d 959, in which we held counsel provided ineffective assistance because counsel presented no evidence at all, had met with the defendant only once, and failed to investigate the defendant's background.

had before it numerous test results and testimony from witnesses regarding Witt's IQ and functioning), *trans. denied*.

Because Abel has not demonstrated the post-conviction court erroneously determined he was not prejudiced, we cannot reverse the conclusion that trial counsel's assistance was not ineffective during Abel's sentencing hearing. *See*, *e.g.*, *Williams v. State*, 706 N.E.2d 149, 156 (Ind. 1999) ("Because the evidence Williams argues should have been presented would not have significantly changed the facts available to the judge and jurors, Williams was not prejudiced during either the guilt or sentencing phase of his trial), *reh'g denied*, *cert. denied*. Accordingly, we affirm.

Affirmed.

ROBB, C.J., and PYLE, J., concur.