


FILED

Nov 17 2020, 10:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 20S-PC-634

## State of Indiana,
*Appellant (Respondent),*

—v—

## Matthew Stidham,
*Appellee (Petitioner).*

Argued: February 27, 2020 | Decided: November 17, 2020

Appeal from the Delaware Circuit Court,
No. 18C02-1602-PC-3
The Honorable Kimberly S. Dowling, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 18A02-1701-PC-68

**Opinion by Justice Goff**

Chief Justice Rush and Justice Massa concur.

Justice David concurs in result.

Justice Slaughter dissents with separate opinion.

**Goff, Justice.**

Seventeen-year-old Matthew Stidham and two others committed a brutal murder and several other crimes in 1991. For these crimes committed as a juvenile, Stidham received a total sentence of 138 years—the maximum possible term-of-years sentence. In 1994, a narrow majority of this Court affirmed the appropriateness of the sentence on appeal and declined to exercise the Court's constitutional authority to review and revise sentences.

In this post-conviction proceeding, we find the extraordinary circumstances required to revisit our prior decision on the appropriateness of Stidham's sentence. Two major shifts in the law—one easing the standard by which we exercise our power to review and revise sentences and another limiting the applicability of the most severe sentences to children—render suspect Stidham's maximum sentence for crimes he committed as a juvenile. So, we reconsider the appropriateness of Stidham's sentence in light of the nature of the offenses and Stidham's character. In doing so, we note the brutal nature of these crimes. However, we also recognize Stidham's steps toward rehabilitation and the impact of the abuse and neglect he suffered earlier in his childhood. Most importantly, we reinforce the basic notion that juveniles are different from adults when it comes to sentencing and are generally less deserving of the harshest punishments. We ultimately conclude that the maximum 138-year sentence imposed on Stidham for crimes he committed as a juvenile is inappropriate, and we revise it to an aggregate sentence of 88 years.

## Factual and Procedural History

Stidham had a difficult childhood. As the probation officer put it in his pre-sentence investigation report, Stidham "was raised in a dysfunctional family" and "was shuffled from pillar to post like a hot potato." Direct Appeal Tr. Vol. 1, p. 243.

Stidham's first twelve years of life consisted of relatively frequent movement between family members, neglect, and abuse. From about age five to age nine, Stidham lived with his father and first stepmother, and

during that time welfare authorities were involved with the family on neglect referrals. Later, from about age eleven through age twelve, he lived with his father and second stepmother and suffered severe abuse at the hands of his second stepmother. She would regularly punish Stidham and his brothers by locking them in and out of the house, hitting them with pans and paddles, punching them, kicking them, and choking them. On one occasion she punished Stidham for having scissors in his room by stabbing him in the chest with the scissors.[1] And on multiple occasions, she punished pre-teen Stidham for failing to clean up after the family dogs by alternatively smearing the dogs' feces in his face or making him eat the dogs' feces. This abuse eventually resulted in the boys' removal from the home. A later child-in-need-of-services report would conclude that Stidham "suffered no permanent physical damage from the injuries he received, however, he carries deep emotional scars which come out as anger, hatred, and defiance toward authority figures." *Id.* at 241 (citation omitted).

After experiencing this neglect and abuse, Stidham ping-ponged between placements with family members and stints in juvenile facilities from age thirteen through age seventeen. In these five years, his placements changed at least nine times, and he attended several different schools. During this time, he also began collecting juvenile adjudications, most of which involved running away or escaping from his residential placement. The State ultimately terminated wardship of Stidham when he was seventeen. All this culminated in the horrific events underlying this case.

One night in February of 1991, seventeen-year-old Stidham and several friends went to Daniel Barker's apartment to drink whiskey and play guitar. At some point, Stidham and Barker got into a fight, and the others at the apartment joined Stidham in beating Barker. They then gagged Barker and forced him toward his van, which they had loaded with some

---

[1] Lest "stabbing" be characterized as a child's exaggeration, testimony at the March 15, 2018 resentencing hearing indicated that Stidham retains the physical scars from this incident.

of his possessions. Barker tried to flee, but Stidham hit him with a wooden club and put him in the van. The group then drove the loaded van to a remote bank of the Mississinewa River. There, they stabbed Barker forty-seven times and threw his body in the river. The group left the scene in Barker's van, told friends of their brutal murder, and drove to Illinois where police arrested them.

Upon returning to Indiana, the State charged Stidham with murder, Class A felony robbery, Class B felony criminal confinement, Class C felony battery, and Class D felony auto theft. A jury found him guilty as charged, and the trial court sentenced him to the maximum aggregate term of 141 years, resulting from consecutive sentences of 60 years for murder, 50 years for robbery, 20 years for criminal confinement, 8 years for battery, and 3 years for auto theft. On direct appeal, this Court ruled that certain evidence had been improperly admitted at trial, reversed the convictions, and remanded for a new trial. *Stidham v. State* (*Stidham I*), 608 N.E.2d 699, 700–01 (Ind. 1993).

On retrial, a jury again found Stidham guilty of the five charges, and the trial court again sentenced him to the maximum 141-year term. Stidham appealed, and this Court affirmed each conviction except auto theft, finding that it should have merged with the robbery charge. *Stidham v. State* (*Stidham II*), 637 N.E.2d 140, 144 (Ind. 1994). In largely affirming the trial court, a majority of this Court rejected Stidham's argument that his sentence was "unreasonable" and "disproportionate to the crime committed." *Id.* However, Justices Sullivan and DeBruler dissented on this point. Relying on the fact that Stidham was a juvenile at the time of the crimes as well as the extensive child abuse he suffered, these two Justices would have revised the trial court's 141-year sentence down to 60 years by running the sentences for each crime concurrently. *Id.* (Sullivan, J., concurring and dissenting). But in the end, Stidham was left with a 138-year sentence for the crimes he committed as a juvenile.

In February of 2016, Stidham filed a verified petition for post-conviction relief. He challenged the propriety of imposing the maximum term-of-years sentence on him for crimes committed as a juvenile, relying on provisions of the United States and Indiana Constitutions, cases from

the Supreme Court of the United States discussing constitutional limitations on juvenile sentences, and cases from this Court revising maximum sentences imposed on juveniles. He submitted evidence of his activities between his first trial and his retrial as well as evidence of his activities since his retrial, which he argued showed his potential for rehabilitation at sentencing and his actual rehabilitation since then.

The post-conviction court granted Stidham's petition. Although it described Stidham's crimes as "heinous," it relied on precedent from both the U.S. Supreme Court and this Court that applied relatively recent scientific research on juvenile development to find that Stidham's "sentence was excessive in light of his age at the time of the offense." Appellant's App. Vol. II, pp. 51–52. After an intervening appeal and a subsequent hearing, the post-conviction court resentenced Stidham to the same maximum terms for each offense as before—60 years for murder, 50 years for robbery, 20 years for criminal confinement, and 8 years for battery—but it did not order each term to be served consecutively. Instead, it provided that Stidham would serve the terms for robbery and criminal confinement concurrent to the term for murder and the term for battery consecutive to the other terms. Thus, the post-conviction court imposed an aggregate 68-year sentence.

The State appealed, and the Court of Appeals reversed. *State v. Stidham* (*Stidham III*), 110 N.E.3d 410, 421 (Ind. Ct. App. 2018). A majority of the Court of Appeals panel concluded that the doctrine of res judicata barred Stidham's challenge to his sentence because this Court had considered and resolved the same issue in *Stidham II*. *Id.* at 420. The majority went on to find that, to the extent Stidham's challenge relied on his improvements since his retrial, he sought an improper sentence modification because he had not obtained the consent of the prosecuting attorney. *Id.* at 420–21 (citing Ind. Code § 35-38-1-17(k) (2015)). Judge May concurred in the result. She noted that, despite res judicata, a court can revisit a prior decision under certain circumstances. *Id.* at 421 (May, J., concurring in result). And, as Stidham did in his petition for post-conviction relief, she quoted at length from this Court's precedent discussing the unique factors involved when considering the propriety of a maximum sentence for a juvenile. *Id.* at 421–23 (quoting *Brown v. State*, 10 N.E.3d 1, 6–8 (Ind. 2014)).

*See also* Verified Petition for Post-Conviction Relief, Appellant's App. Vol. II, p. 8 (same). However, because the Court of Appeals cannot revisit decisions of this Court, she admittedly could not reach the merits to consider the appropriateness of Stidham's sentence, so she concurred in the result of the majority's ruling. 110 N.E.3d at 423.

Stidham petitioned for transfer, which we now grant, thereby vacating the Court of Appeals opinion. *See* Ind. Appellate Rule 58(A).

## Standard of Review

When the State appeals from a grant of post-conviction relief, we apply the clearly-erroneous standard of review. *State v. Oney*, 993 N.E.2d 157, 161 (Ind. 2013) (quoting Ind. Trial Rule 52(A)). Under this standard, we reverse the post-conviction court's judgment "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that [a] mistake has been made." *State v. Green*, 16 N.E.3d 416, 418 (Ind. 2014) (alteration in original) (citation omitted). However, we review the post-conviction court's legal conclusions de novo. *State v. Hollin*, 970 N.E.2d 147, 151 (Ind. 2012).

## Discussion and Decision

In seeking post-conviction relief, Stidham presents multiple arguments challenging the 138-year sentence imposed on him in the early 1990s for crimes he committed as a juvenile. Stidham focuses most of his effort on arguing that his sentence constitutes a discretionary, de facto life-without-parole sentence and that the United States and Indiana Constitutions prohibit such sentences for crimes committed by juveniles. But, in consistently invoking this Court's precedent in which we have exercised our authority under the Indiana Constitution and Indiana Appellate Rule 7(B) to review and revise inappropriate sentences, he also raises a

challenge to the appropriateness of his sentence.[2] *See, e.g.,* Verified Petition for Post-Conviction Relief, Appellant's App. Vol. II, pp. 7–9 (quoting *Brown*, 10 N.E.3d at 6–8; *Fuller v. State*, 9 N.E.3d 653, 657–58 (Ind. 2014)); Br. of Appellee, pp. 28–29 (relying on *Brown* and *Fuller*). We begin our analysis with this appropriateness argument, and, because we find that argument dispositive, we do not reach Stidham's other argument that his sentence constitutes an impermissible discretionary, de facto life-without-parole sentence. *See Gammons v. State*, 148 N.E.3d 301, 304 n.2 (Ind. 2020).

Our analysis of Stidham's argument that his sentence is inappropriate involves two steps. First, we consider the preliminary issue of whether res judicata prevents us from considering the argument and conclude that it does not. Second, we proceed to the merits and find that Stidham's 138-year sentence is inappropriate in light of the nature of the offenses and his character.

## I.  The doctrine of res judicata does not bar consideration of Stidham's appropriateness argument thanks to two major shifts in the law.

Preliminarily, we must determine whether this Court has previously decided the issue of the appropriateness of Stidham's sentence in connection with our constitutional authority to review and revise

---

[2] Toward the beginning of oral argument, Stidham's counsel stated, "7(B) is not available to my client." Oral Argument at 3:33–3:35. But he went on to say, "[A]s to the 7(B) . . . as it relates back to *Brown* and *Fuller*, . . . this exactly applies here . . . ." *Id.* at 7:01–7:11. Considering Stidham's consistent prior reliance on our precedent, and his counsel's later reference to that precedent at oral argument in arguing for Appellate Rule 7(B)'s applicability, we decline to find that Stidham abandoned this argument.

sentences. *See* Ind. Const. art. 7, § 4; Ind. Appellate Rule 7(B).[3] If we have already decided the issue, a procedural bar could preclude our consideration of the issue now.

### A. Despite the doctrine of res judicata, a court can revisit a prior decision in extraordinary circumstances.

"As a general rule, when a reviewing court decides an issue on direct appeal, the doctrine of *res judicata* applies, thereby precluding its review in post-conviction proceedings." *Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006). On direct appeal from Stidham's retrial, this Court considered Stidham's argument that his sentence was "unreasonable" and "disproportionate to the crime committed." *Stidham II*, 637 N.E.2d at 144. Stidham admits that this was a decision on an earlier appropriateness argument. Pet. to Transfer, p. 8 (noting that *Stidham II* "determined whether or not the sentence was manifestly unreasonable" under Appellate Rule 7(B)). Thus, res judicata would normally apply and bar our consideration of the issue now.

Notwithstanding res judicata, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance." *State v. Huffman*, 643 N.E.2d 899, 901 (Ind. 1994) (quoting *State v. Lewis*, 543 N.E.2d 1116, 1118 (Ind. 1989)). This power, though, should be exercised only in "extraordinary circumstances such as where the initial decision was clearly erroneous and would work manifest injustice." *Id.* (quoting *Lewis*, 543 N.E.2d at 1118). Two cases—*Huffman* and *Saylor v. State*, 808 N.E.2d 646 (Ind. 2004)—illustrate instances in which we have found such extraordinary circumstances.

---

[3] Appellate Rule 7(B) provides the standard by which we implement our constitutional authority to review and revise sentences. *McCullough v. State*, 900 N.E.2d 745, 747 (Ind. 2009). However, the standard's location in our rules has changed from time to time. *See Fointno v. State*, 487 N.E.2d 140, 144 (Ind. 1986) (providing the standard located at Rule 2 of the Indiana Rules for the Appellate Review of Sentences at that time). For ease of discussion, we will refer to the standard as the Appellate Rule 7(B) standard, based on its current location, throughout this opinion, rather than referring to it by its various former locations.

In *Huffman*, this Court affirmed the post-conviction court's grant of relief and, in doing so, declined to apply res judicata. During trial, Huffman raised a voluntary intoxication defense, and the trial court instructed the jury that the "burden of proving this defense" rests on the defendant. *Huffman*, 643 N.E.2d at 901 n.2 (citation and alteration omitted). Huffman was convicted, and this Court affirmed on direct appeal. *Id.* at 900. After Huffman sought post-conviction relief, the post-conviction court reversed Huffman's convictions, finding that the trial court committed fundamental error by giving the intoxication instruction. *Id.* at 899. The State appealed that decision, arguing that the post-conviction court erred in granting relief based on the instruction because this Court had already found "that the intoxication instruction was adequate." *Id.* at 901. In affirming the grant of post-conviction relief, this Court recognized res judicata but declined to apply it, noting the Court's power to revisit prior decisions in certain circumstances. *Id.* We acknowledged that "[f]inality and fairness are both important goals," but we went on to conclude that, "[w]hen faced with an apparent conflict between them, this Court unhesitatingly chooses the latter." *Id.* Thus, although we had already addressed a challenge to the jury instruction on direct appeal, we declined to apply res judicata in the post-conviction proceeding and affirmed the grant of post-conviction relief.

In *Saylor*, this Court did not apply res judicata, found Saylor's sentence inappropriate, and revised the sentence despite acknowledging that the Court had previously found the sentence appropriate. A jury found Saylor guilty of murder and other crimes, and the trial court sentenced him to death over the jury's unanimous recommendation against that penalty. *Saylor*, 808 N.E.2d at 647. On direct appeal, Saylor petitioned for 7(B) relief, but we found the death sentence appropriate and refused to revise it. *Id*. at 650. Saylor sought post-conviction relief but was denied, which we affirmed. *Id.* at 648. But we eventually granted rehearing and revised Saylor's death sentence to a term of years. *Id.* We supported our conclusion to revisit our prior decision on the appropriateness of Saylor's sentence, notwithstanding res judicata, by pointing to two important changes in the law since the initial decision. First, we noted that a trial court could no longer impose the death penalty without an affirmative

recommendation from the jury for death. *Id.* at 648, 650, 651 (relying on legislative developments and intervening caselaw). Second, we described how the Appellate Rule 7(B) standard had changed from prohibiting revision unless a sentence was "manifestly unreasonable" to permitting revision if a sentence was "inappropriate." *Id.* at 650. Based on these changes in the law, we revisited our prior decision and found Saylor's death sentence inappropriate.

*Huffman* and *Saylor* provide important guideposts for determining when a court should revisit a prior decision despite res judicata concerns. *Huffman* states that courts should revisit a prior decision only in extraordinary circumstances. But we also explained that, if the question of whether to revisit a prior decision reveals a conflict between finality and fairness, we should choose fairness. *Saylor* shows that changes in the law can sometimes provide the extraordinary circumstances required to revisit a prior decision. This case falls well within those guideposts: it presents the extraordinary circumstances required to revisit our prior decision thanks to the combination of two major shifts in the law since Stidham's direct appeal.

## B. We will revisit our prior decision regarding the appropriateness of Stidham's sentence because of two major shifts in the law.

The first major shift occurred when we changed the standard by which we exercise our authority under Article 7, Section 4 of the Indiana Constitution "to review and revise" sentences. At the time of Stidham's direct appeal, the standard was as follows:

> (1) The reviewing court will not revise a sentence authorized by statute except where such sentence is **manifestly unreasonable** in light of the nature of the offense and the character of the offender.
> (2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate . . . .

*Fointno v. State*, 487 N.E.2d 140, 144 (Ind. 1986) (bold emphasis added) (citation and italics omitted). Under this standard—phrased as a prohibition on revision and turning on the narrow meaning of manifestly unreasonable—revision of term-of-years sentences was "extraordinarily rare" and, in fact, nearly impossible. Hon. Randall T. Shepard, *Robust Appellate Review of Sentences: Just How British is Indiana?*, 93 Marq. L. Rev. 671, 676–77 (2009) (hereinafter Shepard). We later expressed concern that employing such an oppressive standard risked impinging criminal defendants' constitutional right to an appeal. *Serino v. State*, 798 N.E.2d 852, 856 (Ind. 2003).

In light of these concerns, we took "modest steps to provide more realistic appeal of sentencing issues" and promulgated a new standard in 2003. *Id.* at 856–57. This new standard, still in effect today, provides:

> The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is **inappropriate** in light of the nature of the offense and the character of the offender.

App. R. 7(B) (emphasis added). Whereas the old standard represented "a prohibition on revising sentences unless certain narrow conditions were met," the current standard provides "an authorization to revise sentences when certain broad conditions are satisfied." *Neale v. State*, 826 N.E.2d 635, 639 (Ind. 2005). And, along with changing the language of the standard from a prohibition to an authorization, we lowered the bar for relief from "manifestly unreasonable" to "inappropriate." All in all, prisoners seeking sentence revision under the current standard "have experienced an environment decidedly more open than it had been" before, including at the time Stidham initially sought relief. Shepard at 680.

The second major shift in the law occurred when the U.S. Supreme Court began limiting when juveniles could be sentenced to the harshest punishments. More than a decade after Stidham's crimes, trials, and appeals, the Court declared the death penalty unconstitutional for juveniles. *Roper v. Simmons*, 543 U.S. 551, 578 (2005). Several years later, the Court declared life-without-parole sentences unconstitutional for

juveniles convicted of non-homicide offenses. *Graham v. Florida*, 560 U.S. 48, 82 (2010). Shortly after that, the Court again limited the applicability of life-without-parole sentences to juveniles when it held unconstitutional "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller v. Alabama*, 567 U.S. 460, 479 (2012).

The U.S. Supreme Court based these decisions on its recognition of fundamental differences between adults and juveniles. Relying on developments in the fields of psychology, brain science, and social science, along with common sense, the Court summarized three important differences between adults and juveniles: juveniles "have a lack of maturity and an underdeveloped sense of responsibility," an increased vulnerability "to negative influences and outside pressures," and a still-evolving character. *Graham*, 560 U.S. at 68 (quoting *Roper*, 543 U.S. at 569–70). *See also Miller*, 567 U.S. at 472 n.5 (noting that "the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger"). Based in part on these differences, the Court concluded that "juveniles have diminished culpability and greater prospects for reform" and that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 471, 472. Therefore, the Court acknowledged that "*Roper* and *Graham* establish[ed] that children are constitutionally different from adults for sentencing purposes." *Id.* at 471.

This Court has since incorporated the U.S. Supreme Court's reasoning in *Roper*, *Graham*, and *Miller* into our own sentencing cases. In 2014, we relied on the unique attributes of juveniles in reducing maximum term-of-years sentences imposed for crimes committed when the defendants were juveniles in *Brown* and *Fuller*. *Brown*, 10 N.E.3d at 6–8; *Fuller*, 9 N.E.3d at 657–59. In both cases, we noted, "Consistent with the Supreme Court's reasoning this Court has not been hesitant to reduce maximum sentences for juveniles convicted of murder." *Fuller*, 9 N.E.3d at 658 (quoting *Brown*, 10 N.E.3d at 7). Similarly, in 2017, we recognized the importance of considering the inherent differences between adults and juveniles in determining the appropriateness of a sentence when we reduced a juvenile's life-without-parole sentence to a term of years. *Taylor v. State*, 86

N.E.3d 157, 164–67 (Ind. 2017). Thus, since Stidham's direct appeal ran its course in the early 1990s, the U.S. Supreme Court has steadily lowered the ceiling for punishment of juveniles based on its recognition of unique attributes of juveniles, and this Court has relied on the rationales underlying those decisions to revise juveniles' maximum sentences.

The combination of these two major shifts in the law presents the extraordinary circumstances necessary to reconsider our prior decision rejecting Stidham's appropriateness argument. Stidham initially brought his appropriateness argument under the crushing "manifestly unreasonable" standard, which we have since changed "to provide [a] more realistic appeal of sentencing issues." *Serino*, 798 N.E.2d at 856. And he brought his earlier appropriateness argument before the U.S. Supreme Court decided a string of groundbreaking juvenile-sentencing cases and before this Court incorporated the reasoning of those cases into our sentence-revision jurisprudence. Both courts now recognize that juveniles "are less deserving of the most severe punishments." *Miller*, 567 U.S. at 471 (citation omitted); *Brown*, 10 N.E.3d at 7. Yet Stidham received the maximum term-of-years sentence—138 years in total—for crimes he committed as a juvenile. Thus, these major shifts render suspect our prior decision on the appropriateness of Stidham's maximum sentence. Revisiting our prior decision on the appropriateness of Stidham's sentence under these circumstances meets the requirements of *Huffman* and follows the path laid down by *Saylor*, which also relied on the change in the Appellate Rule 7(B) standard and a groundbreaking change in sentencing law. So, we proceed to consider the merits of Stidham's appropriateness argument.

## II. Stidham's maximum term-of-years sentence imposed for crimes he committed as a juvenile is inappropriate.

Appellate Rule 7(B) provides the standard by which we exercise our constitutional authority to review and revise sentences. We "may revise a sentence authorized by statute if, after due consideration of the trial

court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). Whether we find a sentence inappropriate "turns on myriad factors that come to light in a given case" and ultimately "boils down to our collective sense of what is appropriate." *Taylor*, 86 N.E.3d at 165 (cleaned up). Thus, the trial court's findings of aggravators and mitigators does not limit our review under Appellate Rule 7(B). *Brown*, 10 N.E.3d at 4. That said, "[t]he principal role of our review is to leaven outliers rather than achieving a perceived correct sentence.'" *Gibson v. State*, 51 N.E.3d 204, 215 (Ind. 2016) (citation and internal quotation marks omitted).

With this general guidance in mind, we consider whether Stidham's sentence of 138 years, the maximum term of years he could have received at the time, is inappropriate in light of the nature of his offenses and his character.

Stidham's crimes were horrific. A night that started as friends playing guitars together escalated through a series of crimes until the victim was brutally murdered. Stidham and two others severely beat the victim in his own home and stole some of his possessions. They gagged the victim and forced him into his van, with Stidham chasing down the victim when he tried to escape. The group then drove the victim's van, with the victim and his possessions inside, to a hidden riverbank where they violently stabbed the victim forty-seven times before callously throwing his body in the river. The brutal nature of the offenses does not weigh in favor of finding Stidham's sentence inappropriate.

Stidham's character, on the other hand, paints a less damning image. His actions up to the time of his retrial sentencing show a series of negative activities followed by a glimmer of hope for rehabilitation. During Stidham's teenage years, he acquired several juvenile delinquency adjudications, most of which involved running away or escaping from his residential placement. While awaiting sentencing after his first trial, he tried to escape from the Madison County Jail and refused to cooperate in the pre-sentence investigation. And during his time at the Indiana State Prison between his first and second trials, Stidham joined a gang. However, he took several positive steps toward rehabilitation while in

prison between trials. He completed his G.E.D. and began the process to enroll in college courses, and he participated in religion classes and substance-abuse counseling. As a result, Stidham and those around him began to notice a change. Stidham testified about how his newfound sense of accomplishment after completing his G.E.D. and his success in counseling had changed his perspective and helped him mature. In line with his self-assessment, Stidham's DOC Substance Abuse Supervisor noted that "Matt's willingness to learn, his desire to find positive alternatives to replace negative behaviors was apparent." Direct Appeal Tr. Vol. 1, p. 228. And the probation officer who conducted the pre-sentence investigations before Stidham's first trial and his retrial noted the drastic improvement in Stidham's behavior. While Stidham's actions hinted at a potential for rehabilitation, his difficult childhood and his youth at the time of the crimes showed his diminished culpability and provided additional reason for hope.

Stidham had a difficult childhood that continued up until he committed the offenses here at the age of seventeen. "[A] juvenile offender's difficult upbringing . . . can serve to diminish the juvenile's culpability and weigh in favor of a lesser sentence." *Brown*, 10 N.E.3d at 6. *Accord Mullins v. State*, 148 N.E.3d 986, 987 (Ind. 2020) (per curiam) (relying on Mullins's difficult childhood in reducing her sentence). While we need not rehash our earlier discussion of Stidham's troubled childhood, two examples of the abuse he suffered at the hands of his second stepmother illustrate the trauma Stidham experienced as a child. On one occasion she punished pre-teen Stidham by stabbing him in the chest with scissors. And on other occasions, she punished him by smearing dog feces in his face or making him eat dog feces. As a child-in-need-of-services report later concluded, Stidham's childhood inflicted "deep emotional scars" on the boy. Direct Appeal Tr. Vol. 1, p. 241 (citation omitted). And at the sentencing hearing after his retrial, Stidham acknowledged the effect of this abuse: "In a way I see myself acting just like she acted towards us. You know, it's like no matter how much I hated what she did, I still acted like her and . . . it just messed me up all the way around, you know." Direct Appeal Tr. Vol. 5, p. 185. This upbringing does not excuse Stidham's horrible crimes. But, as in

*Brown* and *Mullins*, Stidham's difficult childhood lessens his culpability and weighs against a maximum sentence.

Most significantly here, Stidham was just seventeen years old when he committed the crimes. *See Taylor*, 86 N.E.3d at 166. As noted above, both the U.S. Supreme Court and this Court have recognized that, "[b]ecause juveniles have diminished culpability and greater prospects for reform," they "are less deserving of the most severe punishments." *Miller*, 567 U.S. at 471 (citation omitted). *Accord Brown*, 10 N.E.3d at 7. This conclusion flows from the recognition of three important differences between children and adults. First, juveniles' "lack of maturity and . . . underdeveloped sense of responsibility" leads to "recklessness, impulsivity, and heedless risk-taking." *Miller*, 567 U.S. at 471 (citation omitted). Second, their susceptibility "to negative influences and outside pressures," along with their limited ability to control their environment, can leave them lacking "the ability to extricate themselves from horrific, crime-producing settings." *Id.* (citation omitted). Third, "a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity." *Id.* (internal quotation marks, alteration marks, and citation omitted). "These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" *Brown*, 10 N.E.3d at 7 (alteration in original) (quoting *Graham*, 560 U.S. at 68). Therefore, "juvenile offenders cannot with reliability be classified among the worst offenders." *Graham*, 560 U.S. at 68 (quoting *Roper*, 543 U.S. at 569). Yet, although we have said that "the maximum possible sentences are generally most appropriate for the worst offenders," *Buchanan v. State*, 767 N.E.2d 967, 973 (Ind. 2002) (citations omitted), Stidham received the maximum possible term-of-years sentence for crimes he committed as a juvenile. As we and the U.S. Supreme Court have held before, Stidham's juvenile status weighs against a maximum sentence.

Stidham's progress supports the three reasons provided by the U.S. Supreme Court for why we treat juveniles, especially those subjected to difficult childhoods like Stidham's, differently than adults for sentencing.

Stidham, his DOC Substance Abuse Supervisor, and the probation officer who conducted his pre-sentence investigations all noticed positive changes in Stidham in the time between his first trial and his retrial. And those positive changes have only grown since that time, even though Stidham was staring down a 138-year sentence that all but guaranteed he would die behind bars. After obtaining his G.E.D., Stidham completed the prison's culinary arts program and received his associate's degree (with academic distinction) and bachelor's degree (*magna cum laude*) from Ball State University. He also became a certified firefighter and has worked in the prison fire department for approximately fifteen years, all the while training other members of the department, collecting distinguished certifications, and rising to the rank of captain. At the post-conviction sentencing hearing, Stidham testified that this progress came about as part of his process of "growing up." Resentencing Hr. Tr., p. 16. We do not note these post-sentencing accomplishments as evidence directly concerning the appropriateness of Stidham's sentence at the time it was imposed in the early 1990s. Rather, we reference them as further support for the proposition that a child's lessened culpability and heightened potential for rehabilitation, as compared to an adult, must be considered in sentencing.

Considering all these aspects of the nature of the offenses and Stidham's character, we conclude that the maximum 138-year sentence imposed on Stidham for crimes he committed as a juvenile is inappropriate. While Stidham's crimes were horrific, his character makes this case less suitable for a maximum term-of-years sentence. Stidham's status as a juvenile, his difficult childhood, and his initial steps toward rehabilitation between his first trial and his retrial demonstrate that he was not one of the worst offenders subject to the harshest punishment. We find support for this conclusion in *Stidham II*. There, under the onerous "manifestly unreasonable" standard of Appellate Rule 7(B), and before the U.S. Supreme Court or this Court had thoroughly discussed the unique qualities of juveniles as they pertain to sentencing, Justices Sullivan and DeBruler would have reduced Stidham's sentence based on his age and the abuse he suffered. *Stidham II*, 637 N.E.2d at 144 (Sullivan, J., concurring and dissenting). Considering the shifts in the law discussed in Part I.B.,

*supra*, this case, which resulted in a narrow denial of relief in 1994, merits the grant of relief today. *See Saylor*, 808 N.E.2d at 648, 650–51 (relying on changes in the law to find Saylor's death sentence inappropriate). Our review of the nature of Stidham's offenses and his character shows that Stidham's 138-year sentence is inappropriate.

We now turn to Stidham's revised sentence. In revising a sentence, "there is no right answer in any given case." *Brown*, 10 N.E.3d at 8 (alteration, citation, and internal quotation marks omitted). Rather, "appellate review and revision ultimately boils down to the appellate court's 'collective sense of what is appropriate, not a product of a deductive reasoning process.'" *Id.* (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1224–25 (Ind. 2008)). However, we also consider any precedent "in line with our principal role of leavening outliers." *Taylor*, 86 N.E.3d at 166. As we did in *Taylor*, *Brown*, and *Fuller*, and as we do again today in *Wilson*, we find that the nature of Stidham's crimes and his character warrant a lengthy sentence short of the maximum. *See Taylor*, 86 N.E.3d at 167 (reducing a life-without-parole sentence to an aggregate 80-year sentence); *Brown*, 10 N.E.3d at 8 (reducing a maximum 150-year sentence to an aggregate 80-year sentence); *Fuller*, 9 N.E.3d at 658–59 (reducing a maximum 150-year sentence to an aggregate 85-year sentence); *Wilson v. State*, No. 19S-PC-548, --- N.E.3d --- (Ind. 2020) (reducing a 181-year sentence to an aggregate 100-year sentence). We conclude that Stidham should receive the maximum terms at the time of his offenses for each individual crime—60 years for murder, 50 years for robbery, 20 years for criminal confinement, and 8 years for battery. However, the robbery term should be served concurrent to the murder term, and the murder, criminal confinement, and battery terms should be served consecutively. Thus, we revise Stidham's overall sentence from 138 years to 88 years.

## Conclusion

We affirm the result of the post-conviction court's order granting Stidham relief, revisit our prior decision regarding the appropriateness of his sentence, and revise his sentence to an aggregate term of 88 years. We

remand to the trial court to enter a sentencing order consistent with this opinion.

Rush, C.J., and Massa, J., concur.
David, J., concurs in result.
Slaughter, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT
Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

Eric Hoffman
Chief Trial Deputy Prosecutor
Muncie, Indiana

ATTORNEYS FOR APPELLEE
John C. Reeder
Anderson, Indiana

David W. Stone, IV
Stone Law Office & Legal Research
Anderson, Indiana

ATTORNEYS FOR AMICI CURIAE
Bernice Corley
Joel C. Wieneke
Indiana Public Defender Council,
Juvenile Defense Project
Indianapolis, Indiana

John R. Mills
Genevie Gold
Phillips Black, Inc.
San Francisco, California

**Slaughter, J., dissenting.**

In his petition for post-conviction relief, Matthew Stidham alleged that his term-of-years sentence was a "de facto" life-without-parole sentence that violated the Eighth Amendment to the United States Constitution and Article 1, Section 16 of the Indiana Constitution. And Stidham sought relief consisting of "vacating, setting aside or correcting" his illegal sentence. Yet rather than tackling Stidham's constitutional claims, the Court holds that his sentence is "inappropriate" under Appellate Rule 7(B). Because the Court resolves a claim that Stidham did not raise and awards relief he did not seek, I respectfully dissent.

At no time during this matter did Stidham invoke Rule 7(B) as a ground for relief—not in his trial-court petition; not in his brief in the court of appeals; not in his transfer papers in our Court. Instead, Stidham argued that his sentence was unconstitutional and that he had raised sufficiently different arguments on direct appeal so that res judicata did not preclude reaching the merits of his constitutional claims. In other words, Stidham did not seek to overcome res judicata so courts could decide an unraised 7(B) claim, but so courts could—and would—decide the alleged violations of his constitutional rights. What is more, when asked about 7(B) during oral argument, Stidham specifically disavowed its availability. Indeed, as the following Q&A reflects, only the Court wanted to discuss 7(B).

> Q.  Is that more of a constitutional issue or is that something that fits more appropriately under the Court's 7(B) authority?

> A.  It did not fall under 7(B) because of the nature of the crime. The nature of the crime and the sentence at the time back in 1993 is more of a cruel-and-unusual argument. The court had reviewed that under 7(B), and while 7(B) applied to *Brown* and *Fuller* at the time, it was more of a constitutional issue as to cruel and unusual.

Q.      Is 7(B) not available to your client?

A.      7(B) is not available to my client due to the fact that even though there's been changes in the law, Matt Stidham had already gone to the Indiana Supreme Court previously under the 7(B) and under the current state would make the constitutional claim, which it was framed more from the Indiana Supreme Court at the time as to the 7(B), and that's where it was reduced down to the 138—

Q.      Let's change your argument a little. Let's not concede that so fast—because one thing we have that all the cases that you cite in your brief we do have 7(B), but you've got to get over the res judicata hurdle …

This exchange underscores the Court's resolve to decide this case under Rule 7(B) although Stidham never raised it and expressly disclaimed it. Yet the Court "decline[s] to find that Stidham abandoned this argument." *Ante*, at 7 n.2. Finding Rule 7(B) not "abandoned" is an odd way of describing an argument Stidham never raised in the first place. If Stidham did not "abandon" 7(B), neither did he raise and preserve it, and thus he necessarily waived it. Because the Court awards relief on an alternative ground that Stidham both waived and disclaimed, I respectfully dissent.